```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE MIDDLE DISTRICT OF TENNESSEE
 2                        NASHVILLE DIVISION

 3   FENDER MUSICAL INSTRUMENTS    )
     CORPORATION                   )
 4                                 )
                      Plaintiff,   )
 5                                 )           3:13-CV-01075
     vs.                           )           Nashville, TN
 6                                 )
     KELTON SWADE AND KELTON       )
 7   SWADE, LLC.,                  )
                                   )
 8                    Defendants.  )
     _____)
 9
                    TRANSCRIPT OF SHOW CAUSE HEARING
10            BEFORE THE HONORABLE KEVIN H. SHARP,
         UNITED STATES CHIEF DISTRICT JUDGE KEVIN H. SHARP
11                      FEBRUARY 9, 2017

12   APPEARANCES:

13   For the Plaintiff:        Kilpatrick Townsend & Stockton
                               Theodore H. Davis
14                             Jared S. Welsh
                               1100 Peachtree Street, NE
15                             Suite 2800
                               Atlanta, GA 30309
16

17                             Butler Snow, LLP
                               John C. Hayworth
18                             150 3rd Avenue South
                               Suite 1600
19                             Nashville, TN 37201

20

21   Present:                  Mark D. Van Vleet
                               Chief Legal Officer
22                             Corporate Secretary
                               Senior VP of Business Development
23                             17600 North Perimeter Drive
                               Suite 100
24                             Scottsdale, AZ 85255

25
```

UNITED STATES DISTRICT COURT

```
 1   APPEARANCES, CONTINUED

 2

 3   For the Defendant:            Everette E. Parrish
                                   104 East Park Drive
 4                                 Building 300
                                   Brentwood, TN 37027
 5

 6                                 Charles Carreon
                                   Charles Carreon, Attorney At Law
 7                                 1467 Siskiyou Boulevard, #7
                                   Ashland, OR 97520
 8

 9   Official Court Reporter:      Traci D. Walker, RMR-CRR
                                   Official Court Reporter
10                                 United States District Court
                                   801 Broadway St. Room A-837
11                                 Nashville, TN 37203

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1      INDEX

2

3          INDEX OF EXHIBITS

4

5    EXHIBIT NO:        DESCRIPTION:                    ADMITTED:
        Defendant's 1,2 headstocks                        13
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1    The above-styled cause came on to be heard on February 9,
2    2017, at 2:42 p.m., before the Honorable Kevin H. Sharp, when
3    the following proceedings were had, to-wit:
4          COURTROOM DEPUTY:  All rise, please.
5          THE COURT:  Thanks.  Y'all can be seated.
6          All right.  Before we get started, let me say this:
7    Several years ago I had an IP infringement case, and it
8    involved a game like Guitar Hero and, as part of that process,
9    I got the game, so did y'all bring me anything?  [Laughter.]
10   Any guitars?  Oh, great.  Well, that's useful.
11         Okay.  Well, then, I guess we've got to hear this
12   case.  Yes, sir?  You're ready?
13         MR. DAVIS:  Your Honor, with the Court's permission,
14   I'd like to address an evidentiary matter on behalf of both
15   parties.
16         THE COURT:  Okay.
17         MR. DAVIS:  Both parties have come today with some
18   additional exhibits they would appreciate the Court
19   considering.  We have discussed those before the hearing began.
20   The plaintiff has no objection to the defendant's proposed new
21   exhibits.  Of the plaintiff's proposed new exhibits, we have
22   agreed not to rely upon one.  The defendants have agreed not to
23   object to two of them.  We do have a final exhibit that we
24   anticipate proffering on behalf of the plaintiff that the
25   defendants may have some objections to.

UNITED STATES DISTRICT COURT

```
 1          THE COURT:  Okay.  All right.  Well, let's just wait.
 2    When do you anticipate doing that?  What -- what is your
 3    exhibit that they've got problems with?
 4          MR. DAVIS:  It is a photograph or a screen shot that
 5    we've taken from the defendant's website as of this morning.
 6          THE COURT:  Okay.  What's your objection to that?
 7          MR. CARREON:  Our concern is that, based upon prior
 8    communications between Mr. Swade and Mr. Van Vleet of Fender
 9    that he understood that that was okay.  So my objection is
10    simply going to be by way of cross-examination.
11          THE COURT:  Well, which part of it was okay?
12          MR. CARREON:  I beg your pardon?
13          THE COURT:  What do you mean it was okay?  What --
14          MR. CARREON:  That they had communications about it,
15    and this particular photograph was discussed by Mr. Swade.  And
16    Mr. Van Vleet gave his approval for the use of it in that
17    fashion.  It's like a historic photograph of the gentleman who
18    was a friend of Elvis Presley's, and he's holding a guitar.
19    It's quite an old photograph, and I believe that it -- it
20    predates any disputes in this matter, and there were
21    conversations about it, so...
22          THE COURT:  Well, does that -- does that make it
23    inadmissible, or is it just an explanation as to --
24          MR. CARREON:  Exactly, Your Honor.  The --
25          THE COURT:  The weight of it does not --
```

UNITED STATES DISTRICT COURT

1    MR. CARREON:  -- weight of it does not make it

2  inadmissible.  It makes Mr. Van Vleet subject to examination

3  about that.

4    THE COURT:  Yeah.  I don't think it's inadmissible.  I

5  think -- right?  If that's true, then the weight of it --

6    MR. CARREON:  I agree, Your Honor.

7    MR. DAVIS:  Your Honor, if I might approach the bench

8  and hand it over, it might -- this dialogue might make more

9  sense to the Court.

10    THE COURT:  Yeah.  No, I think I've got it, but that's

11  okay.

12    Let's go ahead and get started.  Have you got

13  witnesses you want to put on?  Anybody got a witness?  No?

14    MR. DAVIS:  We do not.

15    THE COURT:  Okay.  Then let's -- I'll just -- I'll

16  hear you.  We'll start with plaintiff.

17    MR. DAVIS:  Thank you, Your Honor.

18    I will try not to recapitulate in -- in great detail

19  what we have in our moving papers.  But, Your Honor, formal

20  litigation between the parties has been going on for three

21  years now, and the parties' actual dispute has been pending for

22  longer than that.  And the terrible thing is that, for most of

23  that time, this case would have simply gone away and this

24  proceeding would have gone away, had Mr. Swade agreed to stop

25  imitating Fender's federally registered trademarks.  But his

UNITED STATES DISTRICT COURT

1    agreement to do so came only in October 2014 and was
2    memorialized in a settlement agreement between the parties and,
3    more importantly, in this Court's November 12th, 2014 final
4    injunction and -- final judgment and permanent injunction.
5    Since then, Mr. Swade's compliance with the Court's order has
6    been glacial at best.  Although he's made some changes, most of
7    them have come only after Fender has called violations to his
8    attention and had to invest the time and the resources into
9    doing so.

10           And now, at the end of the day, Mr. Swade has become
11   unresponsive to Fender's attempts to resolve the parties'
12   remaining differences without the need to involve the Court.
13   In particular, Mr. Swade has ignored his obligations under
14   paragraph 7 -- 2C of this Court's order to avoid using guitar
15   headstocks that are, quote, "in any way similar to those of
16   Fender."

17           And so, Your Honor, this is not a proceeding in which
18   there should be a -- a complete re-examination of the
19   infringement inquiry or the likelihood of confusion between the
20   parties' products, and the Sixth Circuit has made that very
21   clear in its opinion in *Innovation Ventures*.  That's not what's
22   at stake.  What's at stake is whether the defendants have
23   complied with the Court's injunction.  Fender's moving papers
24   have laid out Mr. Swade's violations in detail, but there are
25   several that merit particular attention.  And the first is I'd

UNITED STATES DISTRICT COURT

1  like to refer to the sign boards over here, and may have to
2  move these closer to the microphone.

3        THE COURT:  That's all right.  How about put them over
4  here so that defense counsel can see them as well.  Just in
5  front of the jury box would be all right.

6        MR. DAVIS:  And, Your Honor, what -- what we have on
7  the sign board are examplars of Fender's federally registered
8  headstock designs.  This is the material on the top.  The
9  bottom row here are materials that are provided by the
10  defendants themselves.  In other words, there should be no
11  question as to the authenticity or accuracy of these graphics.
12  Prior to the injunction being entered by the Court, the
13  defendants were using these headstocks, which corresponded to
14  Fender's designs.  The very bottom row here are examples of the
15  defendant's post injunction headstocks.  And the inquiry,
16  again, according to the -- to the Court's order is:  Are these
17  headstocks in any way similar to those of Fender?  And Fender
18  respectfully submits there could be no material dispute that
19  that is the case.

20        Second, we have a screen shot from the -- the
21  defendant's own website.  And, once again, the Court can see
22  here another example of the use of a headstock that cannot be
23  considered not, in any way, similar to Fender's federally
24  registered Telecaster headstock.

25        Then, Your Honor, on Page 14 of our brief, the Court

UNITED STATES DISTRICT COURT

1  will see that Mr. Swade has posted a video on his YouTube

2  channel that clearly features a guitar with a headstock that

3  also is indistinguishable from that of Fender.  And then, Your

4  Honor, we -- we have the -- the exhibits about which we have

5  just spoken and, with the Court's permission, I'd like to

6  approach the bench.

7           THE COURT:  Okay.

8           MR. DAVIS:  And defense counsel already has a copy of

9  these.

10          And, Your Honor, there are four graphics as part of

11 this exhibit, which we -- we have marked Plaintiff's Exhibit

12 Number 100.  The first two, the parties have agreed so that the

13 Court can consider.  These are Facebook screenshots taken from

14 Mr. Swade's Facebook page as of this morning that clearly show

15 the use of guitar headstocks that are quite similar to those of

16 Fender.  Indeed, they're perfectly indistinguishable from those

17 of Fender.  And on the second page, Your Honor, we have two

18 additional graphics.  The one on the top is the one the

19 plaintiffs have agreed -- Fender has agreed not to rely upon in

20 this proceeding.  And the fourth one is the one as to which

21 there may be some dispute.  But that fourth graphic, again,

22 shows Mr. Swade's use in the promotional context of a Fender

23 headstock.  This appears to be a Fender headstock that is

24 identical -- I mean, and -- and a headstock that was identical

25 to Fender's registered headstock to which no changes have been

UNITED STATES DISTRICT COURT

made.  And Your Honor can see that this was posted on June
29th, 2016, well after this Court's injunction.

      For a finding of contempt, there are only three
requirements.  First, there must be clear and convincing
evidence of a violation, and Fender respectfully submits it has
provided just that, not only in the examples that we've called
to the Court's attention today, but also throughout Fender's
moving papers.

      Second, contempt is appropriate because there is no
evidence that the defendant took all reasonable steps to
comply.  What we've highlighted here today is all within the
defendant's control.

      And then finally, Your Honor, there is no evidence
before the Court, there's no suggestion that the defendants
here cannot comply fully with the injunction at this time.
Again, all of this is within their control.

      There are two other things that are worth pointing out
under Sixth Circuit law.  The first is that enjoined infringers
must keep a safe distance from the plaintiff's mark.  This is a
higher obligation than might otherwise be the case if we were
starting from scratch here.  And the second thing is that
Mr. Swade's good faith is also irrelevant under Sixth Circuit
law.  We have asked for a -- a series of remedies.  Each one of
these is contemplated by the Court's order.  We would like
statutory damages of the amount agreed upon by the parties and

UNITED STATES DISTRICT COURT

ordered by the Court, agreed upon in the parties' settlement
agreement.  That agreement is confidential and we; therefore,
have not put it into the record, but we would like to, and if
the Court grants our request for statutory damages, we will do
so.  We requested award for Fender attorneys' fees, which is
expressly provided for by the Court's order and, additionally,
the settlement agreement, and we would like revision of the
Court's order to enjoin Mr. Swade's current designs, and this
is a remedy expressly contemplated and approved by the Sixth
Circuit's opinion last summer in *LFP IP v. Hustler Cincinnati*.
On that issue, Mr. Swade relies upon Ninth Circuit authority,
rather than the controlling and sole authority of this circuit,
and he does so in a case styled as *Transia v. Ajak*, in which it
was the defendants, the infringing defendants that sought
modification of the -- of the permanent injunction.  And so
that -- that opinion is completely inapposite here.  And in
short, Your Honor, there is nothing to prevent this Court from
looking at the express terms of the agreement, from looking at
the exhibits, the numerous exhibits we have put into evidence
and determining that the defendants are not in compliance with
their obligations under the agreement.  They have had plenty of
warning, plenty of time to comply, and the record clearly
reflects that not only did the parties engage in extensive
correspondence before this motion was filed, but that Fender
shared its moving papers with the defendants months in advance

1  of filing them.  The motion was not a surprise, and a finding

2  of contempt should not be a surprise either to the defendants.

3          Thank you, Your Honor.

4          THE COURT:  All right.  Thank you.

5          MR. CARREON:  Good morning.  Good afternoon, Your

6  Honor.

7          THE COURT:  Good afternoon.

8          MR. CARREON:  Charles Carreon for Mr. Swade.

9          The -- this Court decided a case on -- the written

10 decision came down on December 22nd, 2016.  That's the Sony

11 ATV case, which has provided some additional guidance to me in

12 formulating this argument.

13         I think that the burden that Fender has to carry here

14 is that of showing, by clear and convincing evidence, that Mr.

15 Swade is not in compliance with the agreed final injunction

16 that was entered on November 13th, 2014 by Your Honor.

17         First off, I think looking at the standard by which

18 the Court will consider that level of compliance, and I would

19 like to move -- present a stipulation for the introduction of

20 physical models --

21         THE COURT:  Okay.

22         MR. CARREON:  -- of what are currently being used by

23 Mr. Swade, excuse me, in production.  And these are the ones

24 that I'm -- I'm going to mark right now and if I may?  This,

25 Your Honor, I would mark and move to be marked as Defendant's

UNITED STATES DISTRICT COURT

1   Exhibit Number 1.

2          THE COURT:  Okay.

3          MR. CARREON:  And this I would move to be marked as

4   Exhibit Number 2.

5          THE COURT:  Okay.  Those are admitted.

6    [Defendant's Exhibit Nos. 1 and 2 admitted into evidence.]

7          THE COURT:  Now, for the record, describe which is 1

8   and which is 2.

9          MR. CARREON:  Yes, Your Honor, I'll do that.

10          Exhibit Number 1, Your Honor, is a licensed stock,

11   headstock made by a company called Allparts, and it is in all

12   respects exactly what Fender uses on its own Telecaster guitar.

13   So this will be marked as Defendant's Exhibit Number 1.  And if

14   I may, I will place that on the back of the neck.

15          Exhibit Number 2 is what is called the Kelton Swade

16   AVRS, which has been marked here.  And for a discussion of

17   this -- the comparison between these two, the declaration of

18   Rex Larson was submitted, and Paragraph 9 articulates the

19   various distinctions that exist between these two headstocks.

20          Now, to clarify and make a comparison with the

21   illustrative exhibit that was submitted by Fender, there is a

22   distinction between the physical exhibit that we're presenting

23   here at number two, the AVRS, and this one here that is at the

24   bottom left of the exhibit that Fender has blown up.  And I'll

25   point that distinction out.  What we have here is the -- I

UNITED STATES DISTRICT COURT

1 would call the bulb, what Mr. Larson refers to as --

2          THE COURT:  No, I get it.  And if this was -- if we

3 were at a different part of this case, that would be a great

4 argument.  But aren't we talking about now whether or not

5 they're in any way similar?  Or, no, are you saying that is not

6 the standard that we look at?

7          MR. CARREON:  Exactly, Your Honor.

8          THE COURT:  Well, that was an either/or.  Which one?

9          MR. CARREON:  The safe distance rule should not apply

10 here.  The safe distance rule we have the -- some authority

11 from the Sixth Circuit that says that the safe distance rule is

12 not to be applied against -- against persons who are enjoined

13 pursuant to stipulation but, rather, against persons who have

14 been convicted of infringement.

15          I cited in -- I -- in the opposition papers, I simply

16 discussed the cases in which the safe distance rule had been

17 applied.  I did not note for the Court, and if I could now,

18 note for the Court a couple of cases --

19          THE COURT:  Okay.

20          MR. CARREON:  -- that are relevant precedents in which

21 the Court declined to apply the safe distance rule.  And those

22 are *Broderick*, 41 F.2d I have at 354, Your Honor.  I'll have

23 to give you the complete cite.

24          THE COURT:  That's all right.  I can find it.

25          MR. CARREON:  Thank you, Your Honor.

UNITED STATES DISTRICT COURT

        THE COURT:  Okay.

        MR. CARREON:  And also *Tamko Roofing Products*, that's
T-A-M-K-O, at 282 F.3d at 30.  And my parenthetical here says
applying safe distance rule only after defendant had been found
in conjunction [sic] in contempt of an injunction.

        And these were recently cited in -- relatively
recently by the Sixth Circuit in *The Taubman Company*
T-A-U-B-M-A-N *vs. Webfeats*, W-E-B-F-E-A-T-S, 319 F.3rd 770,
jump cite 780 to 781, and that is Sixth Circuit, 2003.  So I
don't think it's too late to be submitting these --

        THE COURT:  No, that's all right.

        MR. CARREON:  -- by Mr. Larson, primarily because all
they do is guide the Court to take a look at what is there.
And there is no dispute that the Court has authority to simply
make a visual comparison and based on its own lay opinion, to
determine whether Mr. Swade has, in fact, done everything that
is necessary, reasonably necessary to comply with the
injunctions.

        THE COURT:  But what -- in order to comply, it cannot
be in any way similar; right?

        MR. CARREON:  I -- I don't -- well, actually, that
could mislead the Court if we don't take account of what
Mr. Larson has said in Paragraph 10.  And that -- and I, myself
was mislead in that, not being a guitar expert in any way.  And
that is that one major characteristic of both of these Fender

1  headstocks is the flat line and the --

2      THE COURT:  Wait.  What do you mean --

3      MR. CARREON:  -- arrangement of the peg holes.

4      THE COURT:  -- the Fender headstock?  You mean the

5  Swade and the Fender headstock?  What do you mean?  What Fender

6  headstock?  Are you talking about the Stratocaster or the

7  Telecaster?

8      MR. CARREON:  Both of the Fender headstocks --

9      THE COURT:  Okay.

10      MR. CARREON:  -- have this characteristic.  And this

11  was -- this was a nice innovation for guitarists because it

12  enabled them to not reach above and below.  All the tuners move

13  in the same direction.  It's nifty.  It's been adopted, and it

14  is generic, as Mr. Larson points out and as was not disputed in

15  the reply papers.

16      MR. DAVIS:  Your -- Your Honor, I'm sorry to

17  interrupt.

18      THE COURT:  Hang on.

19      MR. DAVIS:  Just for the record, the plaintiff does

20  have an objection to the consideration of Mr. Larson's

21  testimony.

22      THE COURT:  Well, I'm -- I'm going to -- I'm going to

23  let it in.  I'm not sure how useful it is because, first, it

24  was you can just look at it and tell; it's a lay opinion.  And

25  then it was, well, wait a minute, you need an expert to really

UNITED STATES DISTRICT COURT

1  determine it.  Why can't I just look at it and say is this in
2  any way similar?  But I'm still a little bit confused.  Is that
3  the standard we're looking at?
4          MR. CARREON:  The --
5          THE COURT:  And, if not, why not?
6          MR. CARREON:  Well, I think the standard is discretion
7  and --
8          THE COURT:  No, I know.  That's my standard.  But --
9  but in order -- what's -- the language in the consent judgment
10  says:  Can't do -- have anything that's in any way similar --
11          MR. CARREON:  Well --
12          THE COURT:  -- right?  Or am I wrong?
13          MR. CARREON:  Allow me to -- to pull up my copy of
14  that, Your Honor and I -- I had taken a close look at the
15  language of the decree, and what I saw is that we have pictures
16  of the headstocks, and then in Paragraph Sub-C, 2 Sub-C we have
17  the most -- the broadest language, and I'll just paraphrase it,
18  shall completely cease using any identifying characteristic
19  likely to dilute the distinctiveness of the trademarks or
20  identifying characteristics of Fender.
21          And what I am saying is with respect to the peg holes,
22  is that that is -- that cannot be considered an identifying
23  characteristic of Fender, and the Court might not know that,
24  unless that information were passed along through a witness
25  like Mr. Larson.  And I think that it is incumbent upon the

1  Court, with a wise exercise of discretion, to not disregard

2  that information. So I'm not saying that the Court must bend

3  as it might be required to in a case where it was presented

4  with an undisputed expert opinion, which is clearly the case

5  here. I don't think you're required to do that. However, I do

6  think that in the Court's wise exercise of its discretion, it

7  will take into consideration Mr. Larson's observation and,

8  particularly, that I think that a very substantial design

9  element is, in fact, the straight-line peg holes, the straight

10 line at the top. And I simply do not -- and what Mr. Larson

11 further says in both Paragraphs 8 and 9 is that there is a

12 limit to what one can do to a guitar head stock if you are

13 going to go ahead and start with that generic I've got the peg

14 holes across the top design. At that point, you've only got

15 the bottom left to work with, and it can be made substantially

16 distinctive.

17         And so, with that, I think that -- well, my -- what my

18 argument is simply, that this is not the Kelton Swade AVRT head

19 stock marked as Exhibit 2, cannot dilute the distinctiveness of

20 the Fender head stock Number 1. It is distinctive and, to make

21 it clear, this is the current in-production model. There is

22 evidence in the record that after the decree was entered, that

23 Mr. Swade used the design that is here. However, as Your Honor

24 said very succinctly in the *Sony* matter, the purpose of this

25 hearing is not so much to punish, but as to guide, with a bit

1   of stick, the contemnar, if he is found to be in contempt, to

2   guide him to compliance with the injunction. And -- so, for

3   that reason, I think to inform the record completely, the --

4   these observations from Mr. Larson's declaration are highly

5   appropriate for the Court to consider. And I went directly to

6   the dilution language, because I -- I believe that is -- that

7   is -- that is the broadest language in the decree that Fender

8   can cite in its favor here.

9        And I think that if we look at where we are currently

10  and prospectively, we will see that, moving down to

11  subparagraph 2E, the last -- I just highlighted here that:

12  "Defendants, after the entry of this consent judgment, shall

13  have a unique head stock design that is neither identical to,

14  nor will create a likelihood of confusion with any head stock

15  design owned by Fender."

16        And I will also point out that when Mr. Davis says

17  that Mr. Swade was acting at a glacial pace, I think that it is

18  worth taking note of the fact that I was completely unaware

19  that Mr. Van Vleet was having what I would think is appropriate

20  to characterize as ex parte communications with an adverse

21  litigant without my knowledge and permission.

22        THE COURT: Well, is he a lawyer?

23        MR. CARREON: I beg your pardon?

24        THE COURT: I thought it was a -- you're a rep for

25  Fender? You're -- are you counsel for Fender?

UNITED STATES DISTRICT COURT

```
1              MR. VAN VLEET:  Yes, I am.
2              THE COURT:  Okay.
3              MR. VAN VLEET:  I am in-house counsel for Fender, yes.
4              THE COURT:  Okay, sorry.
5              MR. CARREON:  Yes, he is an attorney.
6              THE COURT:  Okay.  I thought you were an officer.
7              MR. CARREON:  And not only that, but, as it happens,
8    during all of this time, I was living in Tucson, Arizona.
9    Mr. Van Vleet's office is in Scottsdale, Arizona.  And on one
10   occasion, we visited together.  I drove up to Scottsdale.  I
11   met with him at Fender offices.  We had a collegial
12   relationship.  And I am not casting dispersions in his
13   direction.  I understand that he was acting in good faith,
14   however, Mr. Swade was trying to conserve on attorney's fees,
15   he never told me about it, Mr. Van Vleet did not ask my
16   permission, and things would not have proceeded at the pace
17   they did if Mr. Van Vleet had said, you know, I'm talking with
18   your client, I'm seeing what's going on.  I really think we
19   need more change faster, Charles.  That would have had a very
20   significant effect on accelerating the pace of these changes,
21   but we do now have them.  And what I am arguing to the Court is
22   that since this is about gaining compliance with -- by a
23   gentleman who I personally know and I think the record
24   establishes, including the e-mails to which I've objected on
25   the grounds that there are settlement discussions and -- and ex
```

UNITED STATES DISTRICT COURT

1  parte communications, but even those, when I see them, I see a
2  mitigating factor of good faith, a gentleman who is trying very
3  hard, who is tendering explanation after explanation and is, in
4  fact, moving.

5         And I will now introduce into the record what I would
6  like to mark as Exhibits 3 and 4.  And I'll describe for the
7  record Exhibit 3 as a Fender Stratocaster head stock.  It
8  actually has a slightly historic prominence.  It is marked John
9  Cruz, who is a well-known electric guitar luthier who works for
10 the Fender Custom Shop, and this was recently removed from an
11 electric guitar played by the lead guitarist of Aerosmith, who
12 allowed Mr. Swade to keep it.

13        And this I'm going to mark as Exhibit 3.  This is the
14 classic Stratocaster design that has now been completely
15 abandoned by Mr. Swade, and his Aviarist guitars now have a
16 head stock that looks like Exhibit 4.  And Exhibit 4 is
17 described by Mr. Larson in declaration -- Paragraph 8.  And he
18 describes the various distinctions that are, to my eye, readily
19 distinguishable.  He describes this as the Kelton Swade AVRS,
20 Exhibit 4, as a -- sort of a art deco -- excuse me, art
21 Nouveau-style design.  He marks a distinction between what he
22 calls the naive bulb on the Stratocaster with the soft,
23 delicate sort of teardrop that appears on the Swade AVRS.  He
24 notes that we have a concave curve here.  The two concave
25 curves intersect on the AVRS Exhibit 4 head stock, where as we

UNITED STATES DISTRICT COURT

1  have contrasting curves, a concave, and a convex, the entire --

2  the size -- overlaying them, we can see that the size is

3  substantially different.  And there is -- I think that as

4  between these two, there can be no way that there would be a

5  mistake made by anyone, even a naive consumer, and it -- the

6  Exhibit 4 head stock does not dilute, in any way, or create a

7  likelihood of confusion that someone will purchase an AVRS

8  thinking that it is, in fact, a Stratocaster.

9          So the -- if we look at all of the facts, what we have

10 is a defendant who was operating somewhat in the dark and -- in

11 the sense that he thought he was working collaboratively almost

12 with Mr. Van Vleet as his partner to try and achieve

13 compliance.  I don't think that he was necessarily moving with

14 the kind of alacrity that Fender might have desired and,

15 frankly, had I been Fender's trademark counsel, and I've done

16 similar cases, I would have wanted it to move along more

17 quickly.  However, none of that is where we are.  The -- the

18 lack of urgency is demonstrated by the fact that Fender has

19 demonstrated no lost sales, no actual injury whatsoever, and

20 has taken a very leisurely pace toward moving through the Court

21 with its dispute.  Also, it never bothered to contact me at any

22 time before actually sending Mr. Swade the proposed moving

23 papers for this motion.  It was at that point that Mr. Swade

24 realized that things had not gone well and --

25          THE COURT:  Okay.  Maybe I misunderstood.  The papers

UNITED STATES DISTRICT COURT

1  were sent to your client, not to you?

2      MR. CARREON:  That is correct, Your Honor.  Of course,

3  I received them through ECF service when they were served.

4      THE COURT:  Right.

5      MR. CARREON:  And when Mr. Swade got them, he sent

6  them along to me.  And at that point I started communicating

7  with Mr. Van Vleet, and I didn't rise to the heights about the

8  issue of the ex parte communications because, as I said, I -- I

9  credited him with good faith in the matter.  However,

10 causationally, in terms of what happened, he would have gotten

11 a lot faster relief if he had called me, because I have

12 considerably more persuasive ability when it comes to Mr. Swade

13 since I can send him a bill for my advice, and that seems to

14 help people comprehend.

15      THE COURT:  Well, there are a lot of reasons that you

16 should have been contacted instead of him.

17      MR. CARREON:  So the -- the Larson declaration, just

18 to summarize, shows that there has been good effort at

19 compliance, and especially the current level of compliance

20 brings us within the scope of the consent decree.  Those are

21 Paragraphs 7 and 8, Paragraph 9, and the generic nature of the

22 peg hole alignment, which prevents the Court from erring by

23 considering elements that are not distinctively Fender as being

24 distinctively Fender.

25      The next thing that I wanted to address was moving on

UNITED STATES DISTRICT COURT

towards the issue of the possibility of a sanction, which I
think is -- while I, in no way, want to suggest that a
sanction --

       THE COURT:  Well, you don't have to go through that,
because that is -- that is not going to happen with this
hearing.  What will happen with this hearing is that I will set
another hearing, and I want to hear some witnesses and decide
those issues, whether it's hearing from your client or --

       MR. CARREON:  Excellent, Your Honor.  That's
exactly as --

       THE COURT:  I won't sanction anybody without getting a
witness on the stand and hearing these things that you are
arguing.

       MR. CARREON:  I may have to apologize in advance for
not being able to attend that hearing, and I'll have Local
Counsel Everett do it.  I have a long schedule of vacation that
starts on the 22nd that takes me to Mexico.

       THE COURT:  How long are you going to be gone?

       MR. CARREON:  Three months.

       THE COURT:  All right.  Okay.

       MR. CARREON:  Yes.  However, I understand, so I -- I
won't address that, except I will address the evidentiary
factor, which is a couple of things.  One is that the screen
shots from the third-party web sites do not establish that
Kelton Swade has continued to market the older preinjunction

1   designs.  And Mr. Larson's declaration sets that forth with
2   third-party evidence which, again, I don't think it's expert
3   evidence.  It is simply there at Paragraph 10.  He states that
4   he's reviewed, and he enumerates the Exhibits C through T and
5   V.  They were not authored by Kelton Swade, and Mr. Swade does
6   not have control, and was not -- did not agree to attempt to
7   exercise control over third-party sales in the secondary market
8   of his guitars, which as he -- sometimes people believe that
9   they have a new Kelton Swade guitar, but they've been relicked
10  to look old.  These guitars just look old.  So people may think
11  that they're selling them, may even advertise them as new
12  because they think it will get more money, but some of these
13  guitars have been around for quite some time and long before
14  any decree was entered.  And so Mr. Swade has no power over
15  those.  The -- and I do not think that -- that they can be
16  counted up and said that each one is a violation because none
17  of them has been established by any reliable evidence to be on
18  the Internet due to Mr. Swade, nor that he would get any
19  revenue from that at all.

20          So if the Court concludes that Mr. Swade has -- did
21  not immediately make sufficient changes to comply with the
22  order, but that he did so prior to the hearing, the Court
23  should not find him in contempt.  There might be some relief
24  available to the defendants for the cost of proceeding, and
25  that would be something that the Court would consider.

1 However, there is plenty of authority that says that if no harm
2 is showed, that attorneys' fees should not be awarded.

3 　　　　The basis for assessing the -- any sanction would have
4 to be based upon admissible evidence and, at this point, I see
5 none.  The defendant has presented evidence that he is in
6 compliance.  He is not contumacious.  He has never been
7 adjudicated an infringer; rather, he agreed to alter his head
8 stock designs.  He didn't do so as quickly or as to the same
9 degree of -- of change as Fender desired.  But where we stand
10 right now is that consumers are at no risk of being confused,
11 and Fender is at no risk of having its trademarks diluted.

12 　　　　THE COURT:  Okay.  All right.  Thank you.

13 　　　　MR. CARREON:  Thank you, Your Honor.

14 　　　　THE COURT:  Tell me, Mr. Davis, where -- where is the
15 harm?  Do you all have any?  Not that it makes a difference on
16 whether or not he's violating this order, but is there any harm
17 that -- that Fender can point to?

18 　　　　MR. DAVIS:  Your Honor, the nature of a trademark
19 right is it identifies the exclusive source.

20 　　　　THE COURT:  I understand that, but I'm just asking if
21 you've been able to identify any real harm?

22 　　　　MR. DAVIS:  No, Your Honor.  As far as monetary --

23 　　　　THE COURT:  I'm not saying that you have to. I'm just
24 saying --

25 　　　　MR. DAVIS:  And --

UNITED STATES DISTRICT COURT

1      THE COURT:  Or anyone who has been confused.  Sorry to

2  keep interrupting you.  Can you identify anyone who's actually

3  been confused?

4      MR. DAVIS:  Not as to these particular examples, what

5  has gone on since the injunction.  But in terms of the harm --

6  again, Your Honor, the trademark symbolizes the -- the -- a

7  single source of the products bearing it.  And if you have a

8  number of -- if you have products coming from a number of

9  different sources that bear the same trademark, the trademark

10  itself is destroyed, it no longer exists, and that's the

11  irreparable harm here.

12      THE COURT:  Here -- here's my gut reaction.  I look at

13  what you're calling the -- the Stratocaster and from whatever

14  distance, I look at that and go, that's not a Stratocaster,

15  right?  You can just look at it and tell.  That's not true with

16  the Telecaster.  I could be confused by that if I'm looking

17  from a distance and -- right, without an expert looking at

18  those things and telling me, well, look at this thing and I go,

19  yeah, yeah, yeah, I see that.  But if I just look at it and I

20  go, that looks like a Telecaster.  There's no way I'm confused

21  by the Stratocaster.  You can look at that and just go that's

22  not a Stratocaster.

23      MR. DAVIS:  Now, with all due respect, Your Honor,

24  that is not the standard we're talking with here.

25      THE COURT:  Well, we are talking about is it in any

UNITED STATES DISTRICT COURT

```
1   way similar?  And I'm looking at it and going, that's not
2   similar in the most vague way.  Here is what I'm saying.  I'm
3   going to set this for another hearing.  I want to hear some
4   witnesses on this but, man, this could have been resolved very
5   easily with somebody working with the defendant and going, you
6   know what?  Okay.  Maybe you're not happy with the
7   Stratocaster.  Work with him and make some changes, and I'm not
8   really happy with the Telecaster.  Make some more changes to
9   that, and then y'all wouldn't be standing here.
10          MR. DAVIS:  And you're right.
11          THE COURT:  This doesn't make any sense.
12          MR. DAVIS:  Your Honor --
13          THE COURT:  Are you willing to do that?
14          MR. SWADE:  Absolutely.
15          THE COURT:  Just work with them and make some changes.
16          MR. CARREON:  I really tried.
17          THE COURT:  Well, you're willing to -- set aside
18  what's happened in the past.  Go do that.  I'm going to set
19  this for a hearing on the -- on the contempt issue.  I think
20  there's enough here that it's worthy of another hearing, but in
21  the meantime, you can all figure this out.  You don't need a
22  Court holding you in contempt to say you can do better because
23  you can do better.  Now, I think this probably would have been
24  resolved a lot easier had somebody -- or sooner, had somebody
25  made a call to the lawyer, not the --
```

UNITED STATES DISTRICT COURT

```
 1        MR. DAVIS:  Your Honor, if I could address that.  I
 2   think there have been some mischaracterizations here.  The
 3   settlement agreement, which again is not in evidence, but if
 4   Your Honor wishes, we'll be willing to submit it under seal,
 5   requires Fender to contact Mr. Swade, not Mr. Carreon.  And
 6   it's also true that during a long period, almost a year's worth
 7   of negotiations between the parties, Mr. Swade identified
 8   another lawyer, not Mr. Carreon, as representing him.  So,
 9   therefore, the communications from Fender went to the lawyer
10   that Mr. Swade specified, not to Mr. Carreon, for the simple
11   reason that Mr. Carreon was no longer involved in the case.
12        THE COURT:  Well, who is that lawyer, somebody here in
13   town?
14        MR. DAVIS:  Jessica Ponce is her name.  If I might ask
15   my colleagues where she's located?
16        THE COURT:  It's not important at this point.  The --
17   and I'm not -- whether he can contact him, or should have
18   contacted him, it's still a true statement that had someone
19   talked to Mr. Carreon, that the lawyers talking to each other
20   could have worked this out.  The Telecaster is too close.  The
21   Stratocaster, you all work on it.  I'm not confused.  But, you
22   know, I still think there's enough here that you are not in
23   compliance with the consent order.  Is it to the level that
24   it's worthy of contempt?  I don't know.  We're going to have a
25   hearing on that.  If it gets resolved before then, then it's
```

UNITED STATES DISTRICT COURT

1  resolved, and everybody's happy and everybody quits spending

2  money. And I'm sure Fender does well, but they don't like

3  paying lawyers when they don't need to, right? I know

4  Mr. Swade doesn't want to keep paying lawyers. It's

5  unnecessary. Just make the changes, comply with this thing.

6  But if you can't, we're going to have this hearing, and I'm

7  going to decide whether or not you're in contempt, and then

8  that -- that provides a whole other level of penalties for you

9  for doing that. Let's just get some guitars on the market that

10 don't confuse people and get back to what you all really do,

11 which is making some music and not spending money on litigation

12 filing paper. That wood could be used for better purposes than

13 more paper. Make a guitar with it or something.

14        All right. So let's do this. I'm going to set this

15 for a contempt hearing.

16        Now, some of you all may or may not be aware that if I

17 set it out too far, I not going to be here to hear this, so I'm

18 going to have -- I'm not going to give you a lot of time.

19 Angie, what have we got in March? What about March 3rd,

20 Friday, March 3rd. When do you leave town? This month?

21        MR. CARREON: I beg your pardon, Your Honor?

22        THE COURT: You're out this month?

23        MR. CARREON: I am.

24        THE COURT: You leave this month?

25        MR. CARREON: Yes, Your Honor, February 22nd. I'm not

1   back until May 24th.

2          THE COURT:  Well, I'm going to go March 3rd, and that

3   gives everybody time to figure this thing out and, if not,

4   we'll have a hearing on it.

5          MR. CARREON:  2:30, Your Honor?

6          THE COURT:  No.  Let's see.  Angie, what will work for

7   us?  Is U.S. versus Frazier going away?  Let's do that.  Let's

8   take the Frazier time.  2:00.

9          Do you know what this -- what's that morning hearing?

10  We'll take the Frazier.  2:00, March 3rd, Friday, unless you

11  all let me know that you've got this figured out, right?

12  Mr. Swade, right?  I said we are going to be here March 3rd,

13  it's a Friday, at 2:00 in the afternoon, unless somebody tells

14  me that you all have figured this out before hand.

15         MR. SWADE:  Yes, sir.

16         MR. DAVIS:  Your Honor, could I bother the Court with

17  a few follow-up questions?

18         THE COURT:  Yeah.

19         MR. DAVIS:  It's my understanding, from the Court's

20  earlier comments, that you would benefit from having live

21  witnesses?

22         THE COURT:  Yes.

23         MR. DAVIS:  Is that correct?

24         THE COURT:  Right, because one of the things is I want

25  to hear from Mr. Swade.

1     MR. DAVIS:  Okay.

2     THE COURT:  And, you know, I'd like to hear some --

3 some expert testimony on -- on confusion and similarity, you

4 know, some of these elements from the -- from the decree, the

5 consent decree.

6     MR. DAVIS:  Your Honor, if the Court is going to

7 entertain Mr. Larson's testimony as that of an expert, will

8 Fender have the opportunity to cross-examine him or depose him

9 in advance?

10     THE COURT:  Yeah.  You can depose him if you want.  If

11 you need to, you can bring your own rebuttal if you want to,

12 but give them enough notice.  You know, you've got to give them

13 enough notice if they want to depose your expert.  I doubt it's

14 necessary that anybody needs to depose an expert.  But you do

15 have to give a report, though.  Then you can decide whether or

16 not you want to depose his rebuttal expert based on his report.

17     MR. CARREON:  If -- I was asked to correct the record

18 with respect to who gave -- this is -- this was actually the

19 Lynyrd Skynyrd guitarist.

20     THE COURT:  All right.

21     MR. CARREON:  And I just want to be clear.  Did I

22 understand the Court to say that the AVRS Exhibit 4 is okay?

23     THE COURT:  No, I didn't go that far.

24     MR. CARREON:  Not that far.

25     THE COURT:  I said that I look at that and I know that

UNITED STATES DISTRICT COURT

1   is not a Stratocaster.

2           MR. CARREON:  Okay.

3           THE COURT:  Does that mean that it's not too similar?

4   I -- you know, I don't know.

5           MR. CARREON:  All right.

6           THE COURT:  That's still hanging out there.  All I'm

7   saying is you hold those two up, and I know which one's the

8   Stratocaster and which one is something else.  I wouldn't know

9   it's a Swade, but I would know it's something else.  You hold

10  up the other two and say pick out the Telecaster, you know, it

11  would take me a second and go, aghh, I think it's that one.

12  That is as lay person as it gets, but -- right?  That's who is

13  out in the market.  They're not all guitarists for Skynyrd, so

14  that they know exactly what they're getting.  A lot of these

15  are out there.  And, you know, if someone is just going into

16  their local music store, they're not going to know.  It looks

17  pretty close.  It may be.

18          MR. CARREON:  I understand, Your Honor.

19          THE COURT:  And if I'm one of those guys walking in,

20  right?  I would have to look at the head stock and go, wait a

21  minute.  That doesn't say Fender.  What's this?

22          MR. CARREON:  I understand.

23          THE COURT:  The other one, I -- I don't need to look

24  at.  I know that's not Fender.

25          MR. DAVIS:  In light of the Court's interest in the

UNITED STATES DISTRICT COURT

```
 1  subject, Fender requests leave to supplement the record with
 2  respect to the extensive lawyer to lawyer communications that
 3  transpired in this case before Mr. Carreon's reengagement in
 4  the case.  Because I'm concerned that the Court does not
 5  understand fully exactly what those consisted of and how
 6  extensive they were.
 7            MR. CARREON:  Well, your Honor, I've been, at all
 8  times, counsel of record.  I've never subbed out.  I've never
 9  stepped away.
10            THE COURT:  Well, that's all right.  It's -- it's not
11  important for what Mr. Swade did or didn't do.  I mean, you can
12  if you want to bill Fender for it.  But am I going to spend a
13  lot of time reading it?  Not much.  So you can tell him whether
14  or not you want to file more paper.
15            MR. DAVIS:  And then, Your Honor, with the Court's
16  permission, I think I would -- I'd like to flag one thing in
17  the record that I think Mr. Carreon will agree with.  I
18  believe, that when referring to Defendant's Exhibit 2, he
19  several times referred to it as Mr. Swade's AVRS model when, in
20  fact, I think the proper reference is AVRT.  Is that --
21            MR. CARREON:  So stipulated.  Thank you.
22            THE COURT:  Yeah, yeah.
23            MR. CARREON:  And, Your Honor, would you like us to
24  keep these exhibits for the Court's convenience, or --
25            THE COURT:  No, just keep them here.  It will be
```

1 easier.  I'll just keep them as part of the file.

2          MR. CARREON:  Okay.  I will finish filling out the

3 exhibit stickers.

4          THE COURT:  All right.  You all go figure this out,

5 all right?  You don't need me to figure this out for you.

6          Mr. Hayworth?

7          MR. HAYWORTH:  Your Honor, may I ask one question?

8          THE COURT:  Yes.

9          MR. HAYWORTH:  I am not available on March 3rd, but I

10 do have co-counsel there, Mr. Malone --

11          THE COURT:  That's --

12          MR. HAYWORTH:  -- from my office.  I don't have his

13 calendar.

14          But I did want to ask the Court, in light of the

15 discussion of Fender spending money, if the Court would

16 entertain a motion to waive the local counsel requirement.

17          THE COURT:  No, no.  If you all -- if you all don't

18 have a substantive role in this, you don't need to be here.

19          MR. HAYWORTH:  Thank you.

20          THE COURT:  Okay.  All right.  Okay.  Anything else

21 you all want to talk about?  Anybody?  Anybody?  Bueller?  No?

22 All right.  We're done.  Thanks.

23          COURTROOM DEPUTY:  All rise, please.

24              [Proceedings concluded at 3:30 p.m.]

25

UNITED STATES DISTRICT COURT

REPORTER'S CERTIFICATE

      I, Traci D. Walker, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

      That I reported on the Stenograph machine the proceedings held in open court on February 9, 2017, in the matter of FENDER MUSICAL INSTRUMENTS CORPORATION VS. KELTON SWADE AND KELTON SWADE, LLC., Case Number: 3:13-CV-01075; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (Pages 1-35) is a true and accurate record of the proceedings.

      This 16TH day of February, 2017.

_____
/s/ Traci D. Walker, RMR-CRR
Official Court Reporter

UNITED STATES DISTRICT COURT